UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
BEIJING DADDY'S CHOICE SCIENCE AND
TECHNOLOGY CO., LTD.,

        Plaintiff,                    **MEMORANDUM AND ORDER**

    - against -                       18 Civ. 6504 (NRB)

PLNDUODUO INC., HONGKONG WALNUT
STREET LIMITED, HANGZHOU WEIMI
NETWORK TECHNOLOGY CO., LTD.,
SHANGHAI PINDUODUO NETWORK
TECHNOLOGY CO., LTD. (n/k/a WALNUT
STREET (SHANGHAI) INFORMATION
TECHNOLOGY CO., LTD.), SHENZHEN
QIANHAI XINZHIJIANG INFORMATION
TECHNOLOGY CO., LTD., HANGZHOU AIMI
NETWORK TECHNOLOGY CO., LTD.,
SHANGHAI XUNMENG INFORMATION
TECHNOLOGY CO., LTD., THE ROYAL
FAVORITE MATERNITY AND BABY
PRODUCTS LIFESTYLE STORE, and JOHN
DOE SELLERS 1-3.

        Defendants.
------------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

     In this intellectual property dispute, a Chinese diaper company seeks to hale into this Court a Chinese e-commerce platform presented exclusively in Mandarin Chinese for transactions effectuated in Chinese currency between Chinese merchants and consumers, which allegedly violate U.S. trademark and unfair competition law. The related entities that collectively represent the e-commerce platform, known as Pinduoduo (hereinafter "PDD"), have moved to dismiss the matter for lack of personal jurisdiction

1

or, in the alternative, failure to state a claim.[1]  See Fed. R. Civ. P. 12(b)(2), (6).  The merchants named as codefendants have yet to be served.[2]

Recognizing the circumstances under which exercising jurisdiction over a wholly foreign website operator like PDD is appropriate, see, e.g., Plixer Int'l, Inc. v. Scrutinizer GmbH, 905 F.3d 1, 4 (1st Cir. 2018), we find that this is far from such a case.  Accordingly, we grant PDD's motion to dismiss on jurisdictional grounds.[3]

**I. Background**

Plaintiff Beijing Daddy's Choice Science and Technology Co., Ltd. (hereinafter "BDC"), which is incorporated in China with its principal place of business in China, is "a leading Chinese baby care brand" that sells its "Daddy's Choice"-brand diapers in stores throughout China and through an authorized online retailer in the United States.  ECF No. 30 at 8, 10.  Of BDC's projected $150 million in total sales for the year 2018, only $120,000 -- i.e.,

---

[1] The PDD defendants are: (1) Pinduoduo Inc.; (2) HongKong Walnut Street Limited; (3) Hangzhou Weimi Network Technology Co., Ltd.; (4) Shanghai Pinduoduo Network Technology Co., Ltd. (n/k/a/ Walnut Street (Shanghai) Information Technology Co., Ltd.); (5) Shenzhen Qianhai Xinzhijiang Information Technology Co., Ltd.; (6) Hangzhou Aimi Network Technology Co., Ltd.; and (7) Shanghai Xunmeng Information Technology Co., Ltd.

[2] The merchant defendants are The Royal Favorite Maternity and Baby Products Lifestyle Store (hereinafter "Royal") and three "John Doe Sellers".

[3] We also note that on or about the same day that the instant case was filed, the plaintiff filed a parallel action against PDD in a Chinese court. An appeal from a decision favorable to PDD in that case is currently pending.

.08% -- were projected to derive from sales in the United States. See id. at 8, 11.

PDD is a "Chinese e-commerce platform" presented exclusively in Mandarin Chinese that hosts listings for Chinese merchants in Chinese currency. Id. at 7. Each of the defendant entities alleged to be "alter egos" of PDD has its principal place of business in China, and all but one is incorporated in either mainland China or Hong Kong, with the remaining PDD entity incorporated in the Cayman Islands. Id. PDD has no physical presence or employees in the United States, and none of its constituent websites or mobile applications is created or populated with content in the United States, where PDD maintains no servers. PDD's Terms of Use expressly provide that all disputes arising from use of the platform are to be governed by Chinese law.

In PDD's words, PDD "acts as a virtual marketplace," connecting merchants with consumers. ECF No. 42 at 4. PDD does not sell, store, or ship any products; rather, it is the individual merchants who effectuate the sales, fulfillments, and deliveries of their own products on their own behalf, with PDD merely deriving revenue from sales effectuated through the platform. "[C]onsumers [] communicate directly with [merchants] through the platform['s]" chat function, and that permits them to "discuss logistics before processing [a given] transaction." ECF No. 30 at 14. To generate

an order through PDD, a consumer must enter the shipping address for the order via a portal that requires the consumer to select a Chinese province, city, and district from a drop-down menu (as well as provide a Chinese mobile phone number) and then enter the remaining address details -- such as a street name and building number -- into a text box. BDC notes, however, that a consumer can circumvent PDD's requirement that a *Chinese* shipping address be utilized by selecting a random (i.e., false) Chinese province, city, and district from the drop-down menu but nonetheless populating the text box with conflicting (yet complete) information for an address located outside of China and independently arranging for the merchant to honor it. Indeed, an agent retained by BDC for purposes of this litigation did exactly that.[4]

Using PDD's chat function, BDC's agent (hereinafter "Wang") contacted 16 different merchants that listed Daddy's Choice-brand diapers for sale on PDD in an effort to find one willing to ship the products to the United States. Their responses were illuminating. While two failed to respond to Wang's inquiries about Daddy's Choice diapers altogether, a third stopped responding after Wang raised the topic of shipping to the United States, and a fourth responded to Wang's request for U.S. shipment

---

[4] BDC's agent likewise entered what she herself described as a "random[]" (i.e., fake) Chinese mobile phone number. ECF No. 43, Ex. A at 13.

by simply stating that the products were out of stock. But the remaining 12 merchants all either stated categorically that they *could* not make such a shipment or insisted that they *would* not do so because the resulting transaction would be commercially unreasonable.

The commercial concern was evidently twofold. First, the merchants recognized that any such shipment would result in a loss to them: because PDD requires merchants to include the cost of shipping in their product prices, irrespective of delivery address -- an approach sensible only if all goods are meant to be shipped within a single country, where variations in real shipping costs are relatively insubstantial -- Wang's payment would not cover the undisputedly higher cost of shipment to the United States. And second, the merchants appreciated that, even if appropriate shipping fees *were* to somehow be factored into Wang's payment, the resulting price-per-diaper would be unnecessarily exorbitant to her, leading several of the merchants to accuse her of joking or lying about her desire for U.S. shipment. See, e.g., ECF No. 43, Ex. A at 15 ("Stop joking around.").

Wang, however, was not easily deterred. Several of her ensuing conversations with the merchants were extensive and featured frequent prodding and false representations by her. In response to the merchants' contrary urging, Wang repeatedly offered to find a way to pay the exorbitant fees required for U.S.

5

shipment -- which were higher than the cost of the diapers to be shipped -- notwithstanding that, as the merchants pointed out, Daddy's Choice diapers were available for purchase in the United States through BDC's authorized retailer. When the merchants continued to balk at the idea, Wang attempted to entice them beyond mere payment of a premium, explaining that she was ordering on behalf of a large group of mothers who would surely continue to place sizable orders if their shipping requests were accommodated. See, e.g., id. at 20 ("We'll be a long-term customer in the future . . . . This isn't a one-off."). When the merchants indicated they had never fielded such a request before and did not even know how to handle the logistics of international shipment, Wang asked them to consult with their colleagues and even proposed specific couriers for them to contact. And when the merchants suggested that Wang have the products shipped to her at a domestic (i.e., Chinese) address and handle the transportation of the products to the United States herself, she claimed that that was not an option for her. None of the merchants indicated that they had shipped to the United States before, and several of them explicitly stated that they had not done so. Excerpts from these exchanges --

provided to the Court in the form of certified translations from Mandarin to English -- are set forth in the margin.[5]

---

[5] Apart from Royal, which is named as a defendant in this matter, the 12 merchants quoted in the excerpts below are labeled simply by the order in which they appear in the document containing the certified translations cited herein.

Merchant 1: "The shipping costs will be very high." Id. at 3. "If you're in America then you should purchase directly in America. . . . It's too expensive to ship from China." Id. at 9.

Merchant 3: "The shipping costs for this are very high, though. . . . [Why] are you [] going to go so far as [to] ship from China to America . . . ? That's not worth it." Id. at 12-13. "[I]t's troublesome for you and troublesome for us. . . . We [] don't [even] have the manpower to go and deal with this matter dear." Id. at 14. "[Use] a domestic address." Id. at 15.

Merchant 4: "[W]e only ship domestically." Id. at 16.

Merchant 5: "No [we will not ship to America]. . . . It's too expensive[;] it's just not worth it for you" and "[w]e don't have a courier to take it to such a far-away place either. . . . We can only ship domestically." Id. at 17-19.

Merchant 6: "No dear [we cannot ship to America, even if the volume is large and even if you pay the shipping costs]. . . . [W]e can't sell it." Id. at 20-21.

Merchant 7: "No [we cannot ship to America]. . . . I'll ship it to [a] home in China and then you can get [] people . . . to send it to you in America. . . . I've never shipped to America. . . . We can't ship it." Id. at 21-23.

Merchant 8: "No, we don't [ship to America]." Id. at 26.

Merchant 10: "No, we don't [ship to America]." Id. at 28. "[T]he shipping costs are . . . too expensive. . . . Why don't you look for another store?" Id. at 30.

Merchant 12: "We haven't [shipped] there before. . . . If you have a friend who's going to America, then they can take it to you. . . . We can't ship it dear." Id. at 31-32. "I've asked[.] Everyone says they can't do it. . . . It's not possible[.]" Id. at 33-34.

Merchant 14: "No, we don't [ship to America]. . . . [Y]ou'd be better off choosing a local brand." Id. at 35-36.

Merchant 15: "Ah. . . . I can ask [if it is possible for us to ship to America] for you." Id. at 36-37. "Dear, [I've asked and] we can't do it." Id. at 38.

Royal: "I don't want to do this, this is not cost-effective at all." ECF No. 43, Ex. A at 22. "Why don't you just buy them over there [in the United States]? You could buy this quality of product locally for a cheaper price than this[,] [a]nd it needs to be sent far away, so it takes a long time." Id. at 18. "[Alternatively,] [y]ou can receive it at [an] address in China and take it [to

Wang, who was hired by BDC specifically to secure at least one shipment to the United States, appears from the transcripts to have been hell-bent on badgering the reluctant merchants in the hopes that she could finally compel one of them to relent. Ultimately, through a conversation that took place over the course of nearly six days, Wang's cajoling was able to break the will of a single merchant: Royal.

Royal originally denied Wang's request for U.S. Shipment on the ground that tender of the purchase price would not be "enough to cover shipping costs." ECF No. 43, Ex. A at 3. When Wang responded by offering to pay the additional shipping costs if such payment could be arranged, Royal persisted in its denial on the ground that that such an arrangement would "[not] be cost-effective for [Wang] at all." Id. Rather than accept that answer, Wang took a series of escalating steps intended to sweeten the pot for Royal. For example, Wang began by representing that she would be purchasing on behalf of "[f]our to five people" and that "[i]f [Royal] c[ould] ship to the US [*sic*]," the group would be willing to "buy a bit more" than had been included in the listing about which she had originally reached out. Id. at 3. Eventually, Wang would come to represent that her "group" contained "140 people," and that she was part of "other groups too," from which she

---

the United States] with you." Id. at 3. "[But] I am absolutely certain that [shipping to the United States] is not cost-effective for you at all." Id. at 23.

"believe[d] there [would] be long-term buyers" if the shipment came through. Id. at 27. As to the quantity of diapers that she sought to purchase, Wang repeatedly amended her request to whatever amount seemed to address the evolving concerns expressed by Royal, which was struggling in real time to figure out the logistics of U.S. shipment. In particular, when Royal suggested to her that the order would have to be substantial to even approach making economic sense (in terms of price per diaper), she offered to purchase ten boxes instead of the one box that she had initially requested; but when Royal later reported that couriers would not accept shipments that were too big, she said that she would be receptive to purchasing only "a few single-pack samples." Id. at 40.

After initially refusing, Royal softened its stance toward Wang in response to her offers, eventually relaying quotes from couriers that Wang had recommended. But as the actual scale of the shipping costs -- which exceeded even those about which Royal had speculated at the outset -- came into finer focus, and Wang nevertheless pressed on, Royal began vacillating between amenability and a return to reluctance. Throughout the six-day conversation, Royal noted the prohibitive "cost" or "expense" of the shipment to Wang more than a dozen separate times. Five days into the conversation, Royal was still asking Wang why she wouldn't "just buy them over [in the United States]," and reminding her that "diapers don't need to cost this much." Id. at 18, 21. When

Wang responded to that renewed expression of concern by reiterating her willingness to pay the exorbitant fees, Royal reverted to its original position, stating "Dear, I don't want to do this[.]" Id. at 22.

Wang stood by her offer, however, and Royal's concern quickly turned to suspicion as to Wang's motivation[6] and the legitimacy of the group that she claimed to represent. Following a back-and-forth in which Royal demanded screenshots of group conversations to prove Wang's membership in the group -- some of which Royal implied might be forgeries -- Royal eventually sent Wang, without comment, an image that provided Wang with the information necessary for her to reach out to Royal outside of PDD's chat function. After Wang evidently did not take the intended cue, Royal asked "Did you see the image I sent you?" and added the cryptic message "There are many things I can't say." Id. at 42. At that point -- the point at which the PDD chat transcript ends -- Wang and Royal evidently utilized an alternative channel of communication to hammer out the final details of a transaction that resulted in a small shipment of Daddy's Choice diapers to Wang's home in Smithtown, New York. Less than a month later, a second (slightly

---

[6] Royal: [W]ith such high shipping costs it is really not cost-effective to send it over. It is probably more expensive than buying locally for you. Wang: [My group and I] are not short on money[.] Royal: I know. But why do you want to do this? Wang: Don't worry, [the members of my group] are headstrong. Royal: [But] [i]t's much more convenient to buy locally. Id. at 42.

10

larger) shipment was arranged and received. Both shipments contained genuine Daddy's Choice diapers that BDC simply had not authorized for sale in the United States.

The resulting orders broke down as follows. For the first order, which involved 48 diapers, Wang paid shipping fees equal to nearly four times the cost of the diapers themselves; for the second order, which involved 300 diapers, the discount Wang received from Royal for purchasing in bulk reduced the shipping fees in relative terms to nearly 1.5 times the cost of the diapers themselves. Yet even with the massive discount that Wang received on the second order, which more than halved the price she paid per diaper compared to the first order, she still paid more than she would have paid to purchase the same number of Daddy's Choice diapers from BDC's authorized U.S. retailer at the *highest* price at which the retailer has ever offered the products in any quantity. See ECF No. 46 at 6.

In order to place the orders through PDD -- which Royal explained to Wang would "not be able to generate an order using a US [*sic*] address" -- Wang entered a fake Chinese phone number and false Chinese address information while simultaneously entering conflicting U.S. address information into the text box for Royal to use. Id. at 6. And in order for Wang and Royal to circumvent PDD's all-inclusive pricing system, they arranged for Wang to place "additional orders" that would not actually be fulfilled by Royal

11

-- i.e., fake orders -- to account for the payment of the additional costs of international shipping. Id. at 7. Finally, Royal falsified the details of the orders by reusing a tracking number from a prior domestic transaction. PDD subsequently determined that the foregoing measures constituted a breach of its terms with its merchants, and all of Royal's products have since been delisted from the platform.

Apart from Royal's two shipments to Wang's residence in New York, the complaint does not identify a single shipment to the United States of products (let alone BDC products) that has resulted from a transaction effectuated through PDD. The complaint merely alleges, "on information and belief," that "other sellers on the . . . platform" have made such shipments.[7] ECF 30 at 19. On the basis of those alleged sales by Royal and the "other" independent merchants -- which BDC alleges involved both unauthorized and counterfeit Daddy's Choice diapers -- BDC asserts claims against PDD in this Court for contributory trademark infringement and unfair competition. PDD moves for dismissal on both jurisdictional and substantive grounds. We address only the jurisdictional arguments here.

---

[7] BDC's original complaint in this matter, which named three John Doe Sellers as the only merchant defendants, included only these general allegations of infringing U.S. sales. It was not until PDD sought leave of the Court to move for dismissal on jurisdictional grounds that BDC, with the Court's leave, amended its complaint to add Royal as a defendant and to plead the allegations concerning Royal's two shipments to Wang.

## II. Analysis

The facts of this case necessitate little analysis. Specific jurisdiction in this Court,[8] whether under New York's long-arm statute or Federal Rule of Civil Procedure 4(k)(2), is subject to the constraints of the Constitution -- namely, the Due Process Clause. And having reviewed the parties' "pleadings and affidavits," Porina v. Marward Shipping Co., 521 F.3d 122, 126 (2d Cir. 2008), the Court is convinced that exercising specific jurisdiction over PDD in this matter would not "comport[] with due process," Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 82 (2d Cir. 2018).

The due process analysis comprises two distinct inquiries: "(1) the minimum contacts inquiry and (2) the reasonableness inquiry." Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 171 (2d Cir. 2010). The former inquiry -- in the specific jurisdiction context -- examines the defendant's alleged forum contacts that gave rise to the plaintiff's claims in order to determine whether they represented a purposeful availment of the privilege of conducting business in the forum and thereby rendered the defendant's involuntary presence in the forum's courts foreseeable. See Charles Schwab Corp., 883 F.3d at 82. The latter inquiry, which proceeds "[i]f the defendant ha[d] sufficient

---

[8] Because it is apparently undisputed (and, in any event, obvious) that PDD cannot be the subject of general jurisdiction in this Court, only specific jurisdiction is discussed herein.

13

minimum contacts," considers the defendant's contacts in light of other factors to determine whether "the assertion of personal jurisdiction [in the forum would be] reasonable under the circumstances of the particular case." Porina, 521 F.3d at 127 (internal quotation marks omitted). For purposes of the due process analysis, the Court hereafter assumes -- in BDC's favor -- that the relevant forum is the entire United States (as opposed to only New York) and still finds personal jurisdiction lacking.

PDD's contacts with the United States were decidedly limited, owed in large part to deliberate measures taken by PDD. As a threshold matter, the mere accessibility of PDD's interactive website to internet subscribers in the United States is, without more, "insufficient to confer jurisdiction." Franklin v. X Gear 101, LLC, No. 17CIV6452GBDGWG, 2018 WL 4103492, at *3 (S.D.N.Y. Aug. 28, 2018). Instead, BDC must show that there was a meaningful level of direct commercial engagement between the PDD platform and those subscribers related to the instant litigation -- a showing that BDC cannot make. See, e.g., id.; Coll. Essay Optimizer, LLC v. Edswell, Inc., No. 14-CV-8586 LAK, 2015 WL 5729681, at *6 (S.D.N.Y. Sept. 30, 2015). BDC stakes its effort to make that showing primarily on allegations that, through the platform, third-party merchants arranged direct sales and shipments of their own infringing products to U.S. consumers. But the "unilateral activity of []other part[ies] or [] third person[s] is not an

appropriate consideration when determining whether a defendant has sufficient contacts with a forum [] to justify an assertion of jurisdiction." Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 417 (1984). And an examination of the arrangement made between Wang and Royal -- the sole consumer-merchant arrangement through PDD with a U.S. nexus that BDC can point to -- reveals not only that PDD was not meaningfully involved in the conduct that resulted in U.S. contacts, but that the arrangement was made possible only by the third-parties' deliberate, collusive, and thorough contravention of features of PDD that were designed specifically to avoid such contacts.

PDD can hardly be said to have purposefully availed itself of the privilege of conducting business in the United States by merely "providing the means for [Wang] to contact Royal," ECF No. 49 at 9, given that the platform, *inter alia*, exclusively utilizes Mandarin Chinese; accepts only Chinese currency; mandates that merchants price their products inclusive of the costs of shipping, which practice only makes commercial sense if all products are meant to be shipped within China; requires the use of a Chinese shipping address and mobile phone number for all orders; and includes a Chinese choice-of-law provision in the Terms of Use pertaining to disputes arising from use of the platform. And it can hardly be said to have been foreseeable to PDD that a consumer like Wang would go to such extraordinary lengths to secure U.S.

shipment of Daddy's Choice-brand diapers, including contacting 16 different merchants in an effort to find one that could be convinced to circumvent the platform[9] at great economic risk to itself[10]; doggedly cajoling -- through both false representations and enticements -- the reluctant merchants over the course of several days until at last one of them relented; walking the ultimately amenable merchant through the logistics of the shipping process herself and proposing a series of alternative plans as obstacles emerged; contacting the merchant outside of the platform's chat function; refusing to take "no" for an answer at multiple points, despite being informed that the transaction would not make commercial sense for her; volunteering to pay excessive shipping fees well beyond what a rational purchaser would pay for the same goods, which she knew were available in the United States

---

[9] BDC argues that arranging for U.S. shipment cannot be said to involve "circumvent[ing] the platform" because PDD (which plays no role in shipping any products) directs consumers to take shipping-related inquiries up with the individual merchants (who actually handle all product shipping) and therefore does not prevent consumers from seeking U.S. shipment from the merchants themselves. Id. BDC relies specifically on an exchange that Wang had over the platform's chat function with a PDD customer service representative during the course of her efforts to establish jurisdiction over PDD, in which the representative responded to her question about whether *PDD* would ship a product to her in the United States by telling her that shipping details should be discussed directly with the merchants. However, that single customer service representative's referral of an inquiry to the proper channel did nothing to displace the features of PDD that would require parties wishing to arrange a shipment to the United States to, for example, input fraudulent information into the platform's shipping portal (while independently agreeing to a different shipping destination), generate fake shipping records, and take other circumventive measures likely violative of the merchant's terms with the platform, as detailed both *supra* and *infra*.

[10] That risk is illustrated by PDD's eventual removal of Royal's full catalogue of items from the platform. And Royal's awareness of that risk *ex ante* was evident from its effort to transition the conversation with Wang off of the platform's chat function.

16

without the added expense and hassle; entering into fraudulent transactions in order to account for the payment of those gratuitous fees; and providing false Chinese address information as well as a fake Chinese phone number to the platform with knowledge that the merchant would generate correspondingly fraudulent shipping records and nonetheless ship the order to an entirely different location. Plainly, it would defy due process to exercise jurisdiction over PDD on the basis of the Wang-Royal arrangement, in which an agent hired specifically for the purpose of manufacturing jurisdiction succeeded in luring a single merchant -- having failed with 15 others -- into her scheme. Cf. Buccellati Holding Italia SPA v. Laura Buccellati, LLC, 935 F. Supp. 2d 615, 623-24 (S.D.N.Y. 2013) (surveying "the vast weight of authority" recognizing that a plaintiff cannot rely on the "manipulative acts" of its own agent "to create jurisdiction"). And as the details of that arrangement reflect, the substantial impediments -- both economic and procedural -- to U.S. shipment of Daddy's Choice-brand diapers through PDD render BDC's conclusory allegations concerning "other" U.S. sales of those products *constitutionally attributable to PDD* for jurisdictional purposes unreasonably speculative.

The only other purported contact between PDD and the United States that is even worthy of discussion involves the PDD mobile app's use of advertising software automated to reference the mobile

user's geolocation.  BDC points specifically to advertisements that Wang viewed through the app while in Smithtown, New York, which -- as translated into English from Mandarin Chinese -- said, for example, "You, at St. James[11], need a high-quality dress," ECF No. 47, Ex. A at 14, 27, and argues that such advertisements constituted a "target[ing]" of consumers in New York sufficient to give rise to jurisdiction over PDD, ECF No. 49 at 11.  This argument is nearly too clever by half and is easily dispatched.

There is simply no basis for concluding that PDD "purposefully sought to do business with" consumers in New York (or any other U.S. state) by virtue of only these advertisements, which were not sent to consumers in New York in any meaningful sense, but rather were automatically generated with regurgitated geolocation data in Mandarin Chinese for any individual who affirmatively downloaded the app and set up an account, and which depicted the same Chinese products sold by Chinese merchants regardless of where they were viewed.  Royalty Network Inc. v. Dishant.com, LLC, 638 F. Supp. 2d 410, 421 (S.D.N.Y. 2009) (finding no purposeful availment on the basis of advertising where the "defendant's interactions with [the forum were] not distinguishable from [its] interaction with . . . any other jurisdiction" (internal quotation marks omitted)).  Indeed, a contrary conclusion as to PDD's intentions would seem

---

[11] St. James, New York is "one town over from" Smithtown, New York.  ECF No. 46 at 3.

particularly odd in view of the obstacles that would greet a consumer in the United States who actually attempted to follow through on one of these advertisements to the point of purchase. And moreover, the implausibility of a nexus between the advertisements and actual U.S.-based transactions -- much less transactions involving Daddy's Choice diapers -- renders the instant case of allegedly infringing sales of those diapers especially inapt for predicating specific jurisdiction on advertising alone. Cf. Virgin Enterprises Ltd. v. Virgin Eyes LAC, No. 08 CV 8564(LAP), 2009 WL 3241529, at *4 (S.D.N.Y. Sept. 30, 2009) (finding mere "advertising -- even advertising directed at New York residents -- [] not enough to give this Court personal jurisdiction" under New York's long arm statute).

Because we therefore conclude that PDD lacked the minimum forum contacts that Due Process requires before specific jurisdiction may be asserted over a defendant, "we need not consider whether [asserting] personal jurisdiction would be 'reasonable' [under] the particular circumstances of th[is] case." Porina, 521 F.3d at 129.

### III. Conclusion

For the foregoing reasons, PDD's motion to dismiss for lack of personal jurisdiction is GRANTED, and the Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 41.

Additionally, BDC is hereby advised that this action will be dismissed as to the merchant defendants without prejudice unless they are served (and proof of such service is filed with the Court) within 14 days of the issuance of this Memorandum and Order.[12] See Fed. R. Civ. P. 4(m).

**SO ORDERED.**

Dated:   New York, New York
         August 6, 2019

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

[12] By letter dated July 11, 2019, the Court informed BDC that this action would be dismissed as to the unserved defendants without prejudice pursuant to Rule 4(m) on July 25, 2019, unless good cause could be shown for BDC's failure to serve those defendants nearly eight months after the operative complaint was filed on November 16, 2018. See ECF No. 53. The Court is not satisfied that BDC's subsequently proffered explanation for this failure of service -- principally, BDC's desire to preserve resources by delaying service during the pendency of PDD's motion to dismiss because the resolution of that motion could moot or otherwise render financially unviable BDC's claims against the merchant defendants -- constitutes good cause. See ECF No. 54. Accordingly, the Court denies BDC's request for an extension of 90 days from the issuance of this Memorandum and Order to effectuate service and submits that the 14-day window granted in its stead is sufficiently generous.

20