UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X

BEIJING DADDY'S CHOICE SCIENCE AND
TECHNOLOGY CO., LTD.,

               Plaintiff,

       - against -

PINDUODUO INC., et al.,

               Defendants.

----------------------------------------X

**MEMORANDUM AND ORDER**

18 Civ. 6504 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    Plaintiff Beijing Daddy's Choice Science and Technology Co., Ltd. brought this case against Pinduoduo Inc. and affiliated companies (collectively, "PDD") for contributory infringement and unfair competition under the Lanham Act and New York law. After this Court granted PDD's motion to dismiss on personal jurisdiction grounds, see ECF No. 55, PDD moved, pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), for $540,620.11 in attorneys' fees and costs, see ECF No 56.[1]

    For the reasons discussed herein, the Court has no hesitancy concluding that this is an "exceptional case" under the Lanham Act

---

[1] The $540,620.11 figure reflects: (1) $514,782.90 in fees for 654.9 hours billed by four attorneys and one legal assistant; and (2) $25,837.21 in costs, which includes $19,619.81 in legal research fees, $460.00 in word processing fees, and $5,757.40 for translation services. The $540,620.11 figure excludes $31,356.90 in fees and costs incurred by individuals at Skadden who billed fewer than 40 hours to the matter, as well as fees incurred in connection with the instant motion. See ECF No. 57 at 8; ECF No. 58 ¶ 6.

1

and that a fee award is warranted. 15 U.S.C. § 1117(a). As detailed below, the Court finds that PDD is entitled to fees and costs in the amount of $386,185.24.

I. **Background**

Plaintiff is a Chinese infant and baby care brand that sells its products, including its "Daddy's Choice" brand diapers, throughout the People's Republic of China and the United States. Defendant PDD is a Chinese e-commerce platform that integrates Chinese social media networks to connect Chinese merchants with Chinese consumers. Third party merchants utilize the platform, which can be accessed through PDD's website and mobile application, to sell products. While PDD derives revenue from the third party sales that the platform facilitates, sales and order fulfilments are handled directly and exclusively by the third party merchants.

As detailed at length in the Court's August 6, 2019 Opinion granting PDD's motion to dismiss,[2] multiple PDD platform features reflect that, at all times relevant to this proceeding, the platform was designed to target consumers and merchants *in China*, and not, as plaintiff maintains, Chinese-American consumers in the

---

[2] The Court assumes familiarity with that Opinion and recites here only the facts and history most relevant to the instant motion. See Beijing Daddy's Choice Sci. & Tech. Co. v. Pinduoduo Inc., No. 18 Civ. 6504 (NRB), 2019 WL 3564574 (S.D.N.Y. Aug. 6, 2019).

2

United States.[3]  Indeed, utilizing the Pinduoduo mobile app to effectuate a delivery to New York required a willingness on the part of plaintiff's agent not only to pay an exorbitant international shipping fee for a product that was readily available for shipment from within the United States,[4] but also the deliberate inclusion of fake Chinese shipping address and cell phone information into a template that, by all appearances, was designed to facilitate shipments solely within China.  Further still, it was only after engaging fifteen merchants who could not be cajoled into making a transcontinental shipment of diapers that plaintiff's agent ("Wang") ultimately convinced a single merchant ("Royal") to make one such shipment to Wang's home in Smithtown, New York.  That shipment required Royal to knowingly utilize false tracking and cell phone information and, among other logistical hurdles, to arrange fake transactions that would account for Wang's payment of shipping fees, thereby circumventing the platform's all-inclusive pricing system and violating its Terms of Use.[5]

---

[3] Among other things, the platform is presented exclusively in Mandarin, lists prices solely in Chinese currency, and -- perhaps most problematically for plaintiff's theory that the platform targets Chinese-American consumers in the United States -- requires consumers to select a Chinese province, city, and district from a drop-down menu in order to effectuate a shipment.

[4] As plaintiff acknowledged in its opposition to PDD's motion to dismiss the amended complaint, "Daddy's Choice diapers are authorized for sale in the U.S. on the Yamibuy website, which is dedicated to providing Asian goods to U.S. consumers."  ECF No. 49 at 7.

[5] PDD's Terms of Use require, for example, that merchants list all-inclusive product prices (i.e., prices that include shipping fees), which only makes commercial sense for the merchants if all products are meant to be shipped domestically (i.e., within China).  See ECF No. 44 ¶ 24.

Perhaps not surprisingly given the confluence of unlikely circumstances that were required to secure a shipment of *authentic*[6] "Daddy's Choice" brand diapers to the United States (including, but not limited to, deliberate circumvention of the platform by both parties to the transaction), Royal's sale to plaintiff's agent was the *only* sale to a U.S. consumer that was alleged in the operative complaint. To be sure, the sale to plaintiff's agent provided the genesis for this proceeding notwithstanding that it was effectuated under wholly contrived circumstances that -- far from reflecting PDD's intent to target Chinese-Americans in New York (or any other U.S. forum) -- revealed effective efforts to *limit* PDD's facilitation of deliveries to U.S. consumers.

**A. Procedural History**

Plaintiff filed the initial complaint in this case on July 19, 2018, alleging that certain "John Doe" sellers were using the platform to sell counterfeit or unauthorized goods to consumers in the United States. In response to the initial complaint, PDD filed a pre-motion letter in connection with an anticipated motion to dismiss, noting, among other things, that the initial complaint "d[id] not allege even a *single* sale on the Platform of any product

---

[6] Notably, the diapers that were shipped to plaintiff's agent as a result of the manufactured transaction, while unauthorized (i.e., intended for sale in China and not the United States), were authentic "Daddy's Choice" products. Accordingly, plaintiff's continued allegations regarding the sale of counterfeit goods to the United States were, if anything, undermined by the shipment secured through plaintiff's elaborate investigation.

4

-– let alone unauthorized 'Daddy's Choice' products giving rise to the causes of action in the Complaint –- to a consumer in the United States." ECF No. 27 at 2 (emphasis in original). In its November 2, 2018 Order granting PDD leave to file the requested motion, the Court *sua sponte* granted plaintiff leave to amend the initial complaint if, consistent with Rule 11, plaintiff could assert additional allegations to cure any of the claimed deficiencies identified in PDD's letter. See ECF No. 29. The Court specifically advised the parties that "it would be in the best interest of both the parties and the Court for the plaintiff to assert [any additional allegations] now, prior to any briefing on the proposed motion." ECF No. 29.

Plaintiff thereafter filed an amended complaint that specifically referenced Royal's sale of allegedly unauthorized products "to a consumer located in New York." ECF No. 30 ¶ 120. It was only after PDD investigated the newly alleged transaction -- which entailed a review of sales records and transcripts of chats between the then-unidentified buyer and Royal (as well as chats between the same buyer and fifteen other merchants in which the buyer had attempted unsuccessfully to solicit sales to New York) -- that it became apparent that the sale had been contrived solely to try to manufacture jurisdiction in this lawsuit. See ECF No. 42 at 5. The findings from that investigation were

detailed in PDD's subsequently filed motion to dismiss, which this Court granted on personal jurisdiction grounds.[7]

Presently before the Court is PDD's Motion for Attorneys' Fees and Costs, ECF No. 57, oral argument for which was held on January 14, 2020.

**II. Legal Principles**

Section 35(a) of the Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). Under Section 35(a), an "exceptional case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." Sleepy's LLC v. Select Comfort Wholesale Corp., 909 F.3d 519, 530 (2d Cir. 2018) (quoting Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 554 (2014)).[8] The "exceptional"

---

[7] PDD's investigation revealed, among other things, that the buyer had registered on the PDD platform only six days before plaintiff commenced this lawsuit and had made only two purchases on the platform in the several days prior to the filing of the initial and amended complaints.

[8] In the context of the parallel attorney fee-shifting provision of the Patent Act, 35 U.S.C. § 285, the Supreme Court in Octane Fitness rejected an earlier interpretation of the term "exceptional case" that limited such cases to those that involved "litigation-related misconduct of an independently sanctionable magnitude" or cases where the court "determine[d] that the litigation was both 'brought in subjective bad faith' and [was] 'objectively baseless.'" 572 U.S. at 554–55 (quoting Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc., 393 F.3d 1378, 1381 (Fed. Cir. 2005)). While the Second Circuit recently held that the less stringent "exceptional case" standard that was articulated in Octane Fitness governs the identically-worded attorneys' fees provision of the Lanham Act, see Sleepy's, 909 F.3d at 530, "[c]ases in

standard "demands a simple discretionary inquiry; it imposes no specific evidentiary burden." Octane Fitness, 572 U.S. at 557.

To satisfy the "prevailing party" prerequisite to a fee award, "a litigant must have 'achieved a judicially sanctioned change in the legal relationship of the parties.'" Manhattan Review LLC v. Yun, No. 16 Civ. 0102 (LAK) (JCF), 2017 WL 11455317, at *4 (S.D.N.Y. Sept. 21, 2017), subsequently aff'd, 919 F.3d 149 (2d Cir. 2019), and subsequently aff'd, 765 F. App'x 574 (2d Cir. 2019) (quoting Mr. L. v. Sloan, 449 F.3d 405, 406 (2d Cir. 2006)).  A defendant may be the "prevailing party" for purposes of an award of attorneys' fees "even if the court's final judgment rejects the plaintiff's claim for a nonmerits reason." Megna v. Biocomp Labs. Inc., 225 F. Supp. 3d 222, 224 (S.D.N.Y. 2016) (quoting CRST Van Expedited, Inc. v. EEOC, 136 S. Ct. 1642, 1651 (2016)).

When evaluating whether a case is "exceptional," district courts have "wide latitude" to "engage in a 'case-by-case exercise of their discretion, considering the totality of the circumstances.'" 4 Pillar Dynasty LLC v. New York & Co., Inc., 933 F.3d 202, 215 (2d Cir. 2019) (quoting Octane Fitness, 572 U.S. at 554).  However, that "'equitable discretion should be exercised in light of the considerations [the Supreme Court] ha[s]

---

this Circuit applying the more flexible Octane standard to the Lanham Act's attorney's fees provision since Sleepy's are limited." Omega SA v. 375 Canal LLC, No. 12 Civ. 6979 (PAC), 2019 WL 2442434, at *3 (S.D.N.Y. June 12, 2019).

7

identified.'" Manhattan Review LLC v. Yun, 765 Fed. App'x 574, 577 (2d Cir. 2019) (quoting Octane Fitness, 572 U.S. at 554). Those considerations are "'frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'" 4 Pillar Dynasty LLC, 933 F.3d at 215 (quoting Octane Fitness, 572 U.S. at 554 n.6).

### III. **The "Exceptional Case" Standard**

In support of its contention that this is an "exceptional case" and that a fee award is warranted, PDD argues: (1) that plaintiff's allegations regarding this Court's personal jurisdiction over PDD were objectively unreasonable; (2) that plaintiff litigated this case in an unreasonable manner by concealing information that it knew would be fatal to its claims; (3) that the circumstances surrounding the filing of this lawsuit suggest that plaintiff initiated this proceeding to disrupt Pinduoduo's U.S. IPO; and (4) that a fee award would further considerations of compensation and deterrence. See ECF No. 57. Plaintiff, for its part, maintains that personal jurisdiction in the context of interactive e-commerce platforms is an evolving area of the law and thus that its personal jurisdiction assertions

were not objectively unreasonable.[9] Plaintiff insists that it initiated this lawsuit solely to protect its U.S. trademark rights, and argues that because it is not a serial Lanham Act plaintiff, a fee award would not further the goals of compensation and deterrence. See ECF No. 65.

Considering the totality of the circumstances in light of the factors set forth in Octane Fitness, the Court has no trouble concluding that this case "stands out from others" and that a fee award is warranted.[10] Sleepy's, 909 F.3d at 530. Simply put, plaintiff chose to pursue its trademark infringement claims in a U.S. forum despite firsthand knowledge that the shipment of its products to the United States through the PDD platform could not be achieved under commercially sensible conditions and without *deliberate circumvention* of the platform's features. Indeed, the extraordinary lengths to which plaintiff's agent went to try to

---

[9] While it is true that "district courts are disinclined to award fees in cases that are close calls or which present novel legal issues or theories," TufAmerica Inc. v. Diamond, No. 12 Civ. 3529 (AJN), 2016 WL 1029553, at *2 (S.D.N.Y. Mar. 9, 2016), this is not such a case. The state of the law concerning personal jurisdiction has limited bearing on the "exceptionality" at issue here -- namely, that plaintiff proceeded with this lawsuit notwithstanding that the lengths to which plaintiff's agent went solely to manufacture contacts with this forum revealed that its claims were implausible.

[10] As a threshold matter, there is no dispute that PDD is a "prevailing party" in this action. Cf. Manhattan Review, 2017 WL 11455317, at *5 (rejecting the argument that "in order to be a prevailing party a court must pass on the merits of the parties' factual allegations and legal arguments"). Notwithstanding that the Court granted PDD's motion to dismiss on a nonmerits basis, its ruling on the issue of personal jurisdiction plainly constituted "a judicially sanctioned change in the legal relationship of the parties." Sloan, 449 F.3d at 407. See also Megna, 225 F. Supp. 3d at 225 ("[D]ismissal for lack of personal jurisdiction . . . is a procedural determination that closes the court to the nonmoving party.").

create jurisdiction in this forum wholly undermined the credibility of its allegations.

While the facts of this case largely speak for themselves, the Court briefly addresses the factors set forth in <u>Octane Fitness</u>, all of which weigh in favor of deeming this case exceptional.

   **A. Frivolity**

"An action is 'frivolous' when either: (1) the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." <u>Livingston v. Adirondack Beverage Co.</u>, 141 F.3d 434, 437 (2d Cir. 1998) (internal quotation marks omitted). That this action was frivolous is evidenced by the fact that the complaint does not allege *a single U.S. shipment effectuated through the PDD platform* other than one secured via plaintiff's own elaborate scheme. Indeed, plaintiff initiated this U.S. lawsuit against PDD (1) despite the numerous hurdles that plaintiff knew any U.S. consumer would encounter in attempting to secure a U.S. shipment of *any* product from the PDD platform, let alone infringing "Daddy's Choice" diapers; and (2) on the basis

of a wholly contrived transaction that, if anything, reflected PDD's efforts at *limiting* contacts with this forum.[11]

**B. Motivation**

With respect to plaintiff's motivation, PDD cites circumstances suggesting that this lawsuit, which was filed several days before PDD's U.S. IPO, was initiated to disrupt PDD's ability to raise capital in the United States. See ECF No. 57 at 9. While the Court declines to speculate about PDD's particular theory, plaintiff's willingness to bring this U.S. trademark lawsuit and allege that PDD was "purposefully interacting with New York consumers," ECF No. 30 ¶ 12(b) -- when it knew full well that its products could not be shipped to the United States absent active circumvention of the PDD platform -- all but compels a degree of skepticism about plaintiff's motivations in filing this lawsuit. Cf. Baker v. Urban Outfitters, Inc., 431 F. Supp. 2d 351, 358 (S.D.N.Y. 2006), aff'd, 249 F. App'x 845 (2d Cir. 2007) (awarding attorneys' fees where the plaintiff's "bad faith motivation" could be inferred from the inclusion in the complaint

---

[11] To date, plaintiff has failed to explain why any rational consumer with a particular affinity for "Daddy's Choice" brand diapers would be willing to go through the various hoops necessary to secure a shipment through the PDD platform, particularly when the same diapers could easily be purchased at a substantially lower cost from a U.S.-based website. Nor can the plainly irrational purchasing behavior that plaintiff's theory necessitates be explained, as plaintiff would have the Court believe, by the group-purchasing preferences of Chinese-American consumers.

of allegations that the plaintiff "had actual personal knowledge . . . were not true").

**C. Objective Unreasonableness**

With respect to plaintiff's litigation conduct, PDD maintains that plaintiff concealed the details of the Royal transaction in its original and amended complaints because plaintiff knew that the extraordinary lengths to which plaintiff went to secure a shipment of its products to the United States would undermine its allegations. <u>See</u> ECF No. 60 at 2-3. The Court agrees. Given the unique circumstances of this case, the Court is skeptical of plaintiff's contention that it "was under no obligation to reveal all of the details regarding its investigation in its complaint or amended complaint." ECF No. 66 at 2. Where, as here, information becomes known to a plaintiff that reveals the implausibility of allegations pled "on information and belief," any decision not to disclose that information is, at best, highly misleading.

More problematic is the uniquely contrived manner in which plaintiff sought to manipulate contacts with this forum in order to create jurisdiction. While courts have long expressed hostility towards finding jurisdiction in cases where the sole contacts with the subject forum are created by the plaintiff's unilateral acts, <u>see, e.g.</u>, <u>Buccellati Holding Italia SPA v. Laura Buccellati, LLC</u>, 935 F. Supp. 2d 615, 623 (S.D.N.Y. 2013) (noting that "the vast weight of authority is that a finding of personal jurisdiction may

not rest solely on an act . . . instigated by a plaintiff"), such cases rarely involve "manufacturing" of the variety at issue here (i.e., deliberate circumvention of a website or mobile application platform so as to effectuate contacts that otherwise would never arise). Such conduct weighs strongly in favor of a finding of exceptionality in this case.[12]

**D. Compensation and Deterrence**

Finally, an award of reasonable attorneys' fees and costs is necessary to compensate PDD for the resources expended in defending this action and to deter plaintiff and others from pursuing similarly frivolous claims going forward. See Manhattan Review, 2017 WL 11455317, at *7 (noting that even where "the merits of the . . . Lanham Act claims have not been addressed . . . the goals of compensation and deterrence are furthered by compensating the defendants for litigating against claims that should not have been brought in the first place"). While there is no indication that the plaintiff in this case is a serial Lanham Act litigant, a fee award remains necessary to deter this plaintiff and others from clogging the U.S. court system with frivolous lawsuits initiated solely on the basis of manufactured contacts.

---

[12] For the avoidance of doubt, the Court does not take issue with the particular ruse that plaintiff's agent undertook in its communications with the third party merchants. The "exceptionality" at issue here is plaintiff's decision to initiate this proceeding and to continue to assert its claims notwithstanding that its own investigation revealed their implausibility.

* * *

Having concluded that this is an "exceptional case" warranting an award of fees, the Court turns to the more challenging determination of the appropriate fee award.

## IV. **Reasonableness of Attorneys' Fees**

PDD was represented in this lawsuit by Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"). In support of its Motion for Attorneys' Fees and Costs, ECF No. 57, Skadden has submitted two declarations setting forth information regarding the individuals at Skadden for whom fees have been requested, as well as the principal categories of their work and the hours and fees billed for that work. See ECF No. 58, ECF No. 70. In light of that information, and having considered the arguments raised by both parties, the Court concludes that an aggregate reduction of 30% of the requested fees is appropriate, resulting in an award of attorneys' fees of $360,348.03 (excluding costs).

This reduction, while not insignificant, is not to suggest that Skadden's representation of its client was in any manner unreasonable or excessive. It goes without saying that PDD was entitled to seek the highest quality representation in this matter and, to that end, to retain a law firm that would leave no stone unturned in its efforts to secure a favorable result. However, the test governing "reasonableness" in the context of a fee-

shifting application is an objective one; "it is not dictated by a particular client's subjective desires or tolerance for spending." Beastie Boys v. Monster Energy Co., 112 F. Supp. 3d 31, 52 (S.D.N.Y. 2015) (noting that "the Court's review of [counsel's] bills suggests that the [client] opted to pay for, and received, the Cadillac Escalade, not the Honda Civic," but that "the issue for this Court is whether it is reasonable to shift the resulting fees to . . . their adversary.").

With that in mind, the reasonableness of the requested hourly rates and hours billed are addressed in turn.

**A. Reasonableness of Billing Rates**

To determine reasonable hourly rates, courts engage in "a case-specific inquiry into the prevailing market rates for counsel of similar experience and skill to the fee applicant's counsel. This may, of course, include judicial notice of the rates awarded in prior cases and the court's own familiarity with the rates prevailing in the district." Farbotko v. Clinton Cty. of New York, 433 F.3d 204, 209 (2d Cir. 2005). The fee applicant bears the burden of documenting the hours reasonably spent by counsel and the reasonableness of the hourly rates claimed. Allende v. United Design, Inc., 783 F. Supp. 2d 509, 512 (S.D.N.Y. 2011).[13]

---

[13] The declarations submitted by counsel state only the number of hours billed per individual and the total fees incurred for those hours. Based on the Court's calculations, the hourly rates break down approximately as follows: for the partner, $1,200; for the attorney holding the position of Counsel, $910;

15

Considering "the range of fees commonly approved in this District for estimable counsel and their staff in complex commercial and intellectual property litigation," Benihana of Tokyo, LLC v. Benihana, Inc., No. 14 Civ. 224 (PAE), 2018 WL 3574864, at *12–13 (S.D.N.Y. July 25, 2018), aff'd, 771 F. App'x 71 (2d Cir. 2019), and in light of the Court's general knowledge and counsel's representation that PDD has already paid the bulk of the fees requested and has agreed to pay the remainder, the Court finds the requested hourly rates reasonable. See Bleecker Charles Co. v. 350 Bleecker St. Apartment Corp., 212 F. Supp. 2d 226, 230 (S.D.N.Y. 2002) ("[N]egotiation and payment of fees by sophisticated clients are solid evidence of their reasonableness in the market." See also Vista Outdoor Inc. v. Reeves Family Tr., No. 16 Civ. 5766, 2018 WL 3104631, at *6 (S.D.N.Y. May 24, 2018) (approving an hourly billing rate of $1,260.00 for a partner "in the New York City 'big firm' market"); MSC Mediterranean Shipping Co. Holding S.A. v. Forsyth Kownacki LLC, No. 16 Civ. 8103 (LGS), 2017 WL 1194372, at *3 (S.D.N.Y. Mar. 30, 2017) (approving hourly rates for associates of up to $753.42 per hour).

---

for the fourth-year associate, $630; for the second-year associate, $400; and for the legal assistant, $310.

**B. Reasonableness of Hours Billed**

To determine whether the number of hours billed is reasonable, "[t]he court looks at the amount of time spent on each category of tasks, as documented in the timekeeping records, and whether these hours were 'reasonably expended.'" Prospect Capital Corp. v. Enmon, No. 08 Civ. 3721 (LBS), 2010 WL 2594633, at *4 (S.D.N.Y. June 23, 2010) (quoting Louis Vuitton Malletier v. Dooney & Bourke, Inc., No. 04 Civ. 5316 (RMB) (MHD), 2007 WL 1284013, at *1 (S.D.N.Y. Apr. 24, 2007)). "If the court finds that some of the time was not reasonably necessary to the outcome, it should reduce the time for which compensation is awarded." Tucker v. City of New York, No. 08 Civ. 4753 (VM), 2010 WL 1191636, at *6 (S.D.N.Y. Mar. 25, 2010). Where it is difficult to make line-item reductions, "the court has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application." Rodriguez ex rel. Kelly v. McLoughlin, 84 F. Supp. 2d 417, 425 (S.D.N.Y. 1999) (quoting Kirsch v. Fleet St., Ltd., 148 F.3d 149, 173 (2d Cir. 1998)).

Having reviewed the principal categories of work performed by Skadden personnel and the total number of hours spent on that work, the Court concludes that an aggregate reduction of 30% of the hours billed is appropriate to ensure that the overall fee award reflects "the minimum necessary to litigate the case effectively." Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany &

17

Albany Cty. Bd. of Elections, 522 F.3d 182, 190 (2d Cir. 2008). This reduction represents the Court's carefully considered (albeit inevitably imperfect)[14] attempt to account for, *inter alia*, (1) counsel's request for fees incurred in connection with the initial motion to dismiss, which motion ultimately was not filed with the Court;[15] (2) occasions in which more hours may have been expended on particular tasks (e.g., legal research) than was necessary; and (3) instances in which more than one lawyer was assigned to a particular task without evident justification.

**C. Recoverable Costs**

Plaintiff has not raised any objection specific to PDD's request for the reimbursement of certain costs, and "[t]he Second Circuit has consistently held that 'attorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients.'" TufAmerica, 2016 WL 1029553, at *7 (quoting U.S. Football League v. Nat'l Football League, 887 F.2d 408, 416 (2d Cir. 1989). In light of Skadden's

---

[14] The case law in this Circuit recognizes the impracticalities and inevitable imprecision that can result from a line-by-line or task-by-task analysis of requested fee awards, and the Court declines to undertake such an analysis here.

[15] The Court's Individual Rule of Practice 2(B) contemplates the filing of pre-motion letters prior to formal briefing precisely to avoid duplicative or unnecessary work of the kind performed here. As the Court advised the parties when it granted plaintiff leave to amend its complaint, "it would be in the best interest of both the parties and the Court for the plaintiff to assert [any additional allegations] now, prior to any briefing on the proposed motion." ECF No. 29. Recognizing, however, that some portion of the work performed in connection with the motion to dismiss the initial complaint proved useful to the subsequently filed motion, the Court declines to eliminate from the fee award all hours incurred in connection with that motion.

representation at oral argument that the requested costs are regularly assessed to its clients, PDD's request for $25,837.21 in costs is properly recoverable.

## V. Conclusion

For the foregoing reasons, PDD's Motion for Attorneys' Fees and Costs is GRANTED in the amount of $386,185.24 ($360,348.03 in attorneys' fees and $25,837.21 in costs). The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 56, and to close this case.

**SO ORDERED.**

Dated:   New York, New York
         February 13, 2020

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE